**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**Holding a Criminal Term**
**Grand Jury Sworn in on November 16, 2009**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.** |
| | : | |
| | : | **GRAND JURY ORIGINAL** |
| **v.** | : | |
| | : | **VIOLATIONS:** |
| **RENALDO D. GILLIS,** | : | |
| **also known as Renardo Gillis,** | : | **18 U.S.C. § 1349 (Conspiracy);** |
| | : | **18 U.S.C. § 1344 (Bank Fraud);** |
| **and** | : | **18 U.S.C. § 1341 (Mail Fraud);** |
| | : | **18 U.S.C. § 1343 (Wire Fraud);** |
| **AFOLASADE OREKOYA,** | : | **18 U.S.C. § 2 (Aiding and Abetting and** |
| | : | **Causing an Act to be Done);** |
| **Defendants.** | : | **18 U.S.C. § 981(a)(1)(C) and** |
| | : | **28 U.S.C. § 2461(c) (Criminal Forfeiture).** |
| | : | |

**INDICTMENT**

The Grand Jury charges that:

**COUNT ONE**

**(CONSPIRACY)**

**Introduction**

At all times material to this Indictment:

1.      Defendant RENALDO D. GILLIS, also known as RENARDO GILLIS

(hereinafter "defendant GILLIS"), was a licensed appraiser in Virginia, Maryland, the District of

Columbia, and Georgia.  Defendant GILLIS owned, operated, and controlled at least two

companies, Market Watch, LLC (hereinafter "Market Watch") and Investment 2000 Corporation

(hereinafter "Investment 2000").  Defendant GILLIS was purportedly engaged in the residential

real estate investment business, in that he purchased and sold numerous residential properties in nominee names.

2.      Defendant AFOLASADE OREKOYA (hereinafter "defendant OREKOYA") resided and worked in the District of Columbia.  She was a licensed real estate agent in the District of Columbia and worked as an independent loan processor for various mortgage brokers, including Century Finance Funding, LLC (hereinafter "Century Finance") and BancStar on Capitol Hill, LLC (hereinafter "BancStar").  As an independent loan processor, she was responsible for preparing and processing mortgage loan applications and related paperwork in order to qualify nominee buyers for residential mortgage loans from various banks and lending institutions.

3.      Co-conspirator A, whose identity is known to the Grand Jury, was a licensed attorney and a title and settlement agent.  Co-conspirator A was the owner of C.T.G., LLC (hereinafter "C.T.G."), which maintained offices in Temple Hills, Wheaton, and Marlow Heights, Maryland.  As a title and settlement agent, Co-conspirator A was responsible for preparing settlement statements, issuing title commitments and policies, collecting borrowers' cash at closing, disbursing mortgage proceeds and other funds, and insuring that relevant paperwork was properly completed for real estate closings.

4.      Co-conspirator B, whose identity is known to the Grand Jury, was the president and owner of C.T. & E., Inc. (hereinafter "C.T. & E."), a title company with offices in Laurel, Maryland and the District of Columbia.

5.      Co-conspirator C, whose identity is known to the Grand Jury, was a settlement agent who initially worked at C.T.G., then resigned from C.T.G. and went to work for C.T.& E.

as the manager of C.T. & E.'s Washington, D.C. office.

6.     Co-conspirator D, a former employee of Market Watch, whose identity is known to the Grand Jury, was a real estate appraiser licensed in the District of Columbia, Maryland, and Virginia.  After Co-conspirator D left Market Watch, he conducted his appraisal business under the name of A. Inc.  As a real estate appraiser, Co-conspirator D was responsible for independently appraising the value of houses and causing his appraisals to be submitted to lending institutions so that the lending institutions could rely on the appraisals in determining whether to fund mortgage loans.

7.     Co-conspirators E and F, former employees of Market Watch, whose identities are known to the Grand Jury, were licensed real estate appraisers.

8.     Co-conspirators G, H, I, J, K, L, M, N, O, P, Q, R, S, T, and U (hereinafter collectively referred to as "straw buyers"), whose identities are known to the Grand Jury, were individuals who were solicited by defendant GILLIS to invest in real estate by using their credit to qualify for and obtain mortgage loans in exchange for payments and/or tax benefits.

9.     Century Finance was a mortgage brokerage company doing business in Maryland and the District of Columbia.  Century Finance obtained financing for the purchase of residential properties in the District of Columbia metropolitan area from various mortgage lenders.

10.    BancStar was a mortgage brokerage company doing business in District of Columbia.  BancStar obtained financing for the purchase of residential properties in the District of Columbia metropolitan area from various mortgage lenders, including, but not limited to, Fremont Investment & Loan and Novastar Mortgage, Inc.

11.    Wells Fargo, N.A. and SunTrust Bank, N.A. were financial institutions whose

accounts were insured by the Federal Deposit Insurance Corporation, as provided by 18 U.S.C. § 20.

12.     The following entities were lending institutions that accepted applications for and funded residential real estate loans: Acoustics Home Loans, LLC, Finance America, LLC, Fremont Investment & Loan, Meritage Mortgage Corp., Novastar Mortgage, Inc., and WMC Mortgage Corp.

13.     Wells Fargo, N.A. and SunTrust Bank, N.A., along with other non-bank mortgage lending entities (hereinafter collectively referred to as "lenders"), were in the business of, among other things, lending money to individuals to purchase residential real estate ("buyers").

14.     In order to approve a mortgage loan, the lenders required:

   a.     that a buyer document that she had sufficient monthly income and assets to pay the mortgage and to make the required cash contribution toward the purchase of the property;

   b.     a truthful Uniform Residential Loan Application;

   c.     written or telephonic contact with the buyer's employer verifying that the buyer was employed with sufficient income, as well as written or telephonic contact with the buyer's bank and/or landlord verifying that the buyer had cash and a history of paying monthly obligations; and

   d.     a cash contribution (also known as "cash from borrower") to purchase the residential property.

15.     Lenders of mortgage loans typically do not lend money for the full purchase price of the property; rather, lenders normally made loans for less, and required that the buyer use some of his or her own funds for the purchase of the property. This gives the lenders assurance that the buyer, with some of his or her own money invested in the property, has an incentive to remain current on his or her mortgage payments to avert foreclosure, and that the lender would be

able to recover the full proceeds of the loan in the event of foreclosure.

16.     These residential loans may either be for a property which was in need of repair and rehabilitation (in such a case, the lender would stipulate that a portion of the loan be put in escrow until renovations were completed), or for a property which did not need repair and renovation, or for a property which had already undergone renovation in which case loan money may be approved to pay for the already completed improvements.  Lenders required that a licensed appraiser provide an assessment of the property's condition and value before lending money for the purchase of real estate.

17.     If a loan were approved, the lenders would instruct a title company to prepare for a settlement, that is, a meeting where the buyer and seller would sign the Deed (transferring legal title), Note (promise to pay the loan), Deed of Trust (public notice that the property is encumbered with a mortgage), Settlement Statement (an accounting of the disbursement of loan money and a listing of cash due from the buyer), and other documents.  The lender would typically  provide the settlement agent with instructions on how to secure the bank's interest in the property.

18.     At the settlement, the title company would receive the loan money from the mortgage lender and the buyer's cash contribution.  Thereafter, the title company would then pay the costs of the settlement, debts of the property or seller, and any other authorized expenses.

19.     After settlement, the title company would submit the Deed and Deed of Trust for filing with the District of Columbia's Recorder of Deeds (if the property were in the District of Columbia), with instructions that the Recorder of Deeds return to the title company the stamped recorded Deed as proof that the legal title to the property was transferred from seller to buyer.

Thereafter, the settlement company would forward the filed documents to the lender and the buyer would be responsible for paying the mortgage loan as agreed.

20.     The United States Department of Housing and Urban Development (hereinafter "HUD") maintained a housing assistance program (commonly referred to as the "Section 8" housing program).  Through local housing authorities, HUD provided direct payments to private land owners who rented residential units to low and very low income families so that these families could live in decent, safe, and sanitary housing.  This rental assistance made up the difference in what the family could afford and the approved market rent for housing adequate for the family.  In the District of Columbia, this Section 8 program was administered through the District of Columbia Housing Authority (hereinafter "DCHA").

## The Conspiracy

21.     Paragraphs 1 through 20 are incorporated by reference and realleged as though fully set forth herein.

22.     Between in or about September 2003, and continuing thereafter through at least November 2009, in the District of Columbia and elsewhere, defendant GILLIS and defendant OREKOYA (hereinafter also collectively referred to as "the defendants") did unlawfully, willfully, and knowingly conspire, combine, confederate, and agree with other persons both known and unknown to the Grand Jury to commit offenses against the United States, namely:

      a.      bank fraud, accomplished by their engaging in a scheme to defraud and obtain money and property from financial institutions by means of false and fraudulent pretenses, representations, and promises, in violation of 18 U.S.C. §§ 1344 and 2;

      b.      mail fraud, accomplished by their engaging in a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses,

representations, and promises, and for the purpose of executing, and attempting to execute, the scheme to defraud, willfully caused to be deposited mail matter to be delivered by the United States Postal Service or private and commercial interstate carriers, in violation of 18 U.S.C. §§ 1341 and 2; and

c.  wire fraud, accomplished by their engaging in a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, and for the purpose of executing, and attempting to execute, the scheme to defraud, willfully caused writings, signs, and signals to be transmitted by means of wire communication in interstate commerce, in violation of 18 U.S.C. §§ 1343 and 2.

## Goal of the Conspiracy

23.    It was a goal of the conspiracy that defendant GILLIS and defendant OREKOYA and their co-conspirators, both known and unknown to the Grand Jury, would defraud mortgage lenders of money by obtaining excessive mortgage loans on properties through fraudulent loan applications, false appraisals, and fraudulent settlements, with such sales generating large cash proceeds which defendant GILLIS, defendant OREKOYA, and the co-conspirators shared amongst themselves.

## Manner and Means

24.    It was a part of the conspiracy that defendant GILLIS, defendant OREKOYA, and their co-conspirators would identify District of Columbia area homes to buy through false loan applications, fraudulent appraisals, and settlements.

25.    It was further part of the conspiracy that the co-conspirators, including defendant GILLIS and defendant OREKOYA, found straw buyers who were not qualified to purchase the houses, and would arrange for mortgage loans through forged or fraudulent documentation and false information.

26.     It was further part of the conspiracy that under false and fraudulent pretenses, defendant GILLIS and defendant OREKOYA, through Century Finance and BancStar, would knowingly submit and cause to be submitted false and fraudulent information to lenders in order to procure mortgage financing for the straw buyers who served as nominees for the defendants and their co-conspirators.

27.     It was further part of the conspiracy that under false and fraudulent pretenses, defendant OREKOYA, through Century Finance and BancStar, would obtain loan closing fees, mortgage brokerage fees, and/or commissions from various banks and mortgage lenders in connection with the procured fraudulent loans.

28.     It was further part of the conspiracy that, in the District of Columbia and elsewhere, defendant OREKOYA would put together loan files for straw buyers who were recruited by defendant GILLIS and other co-conspirators, and submit these loan files for approval to the banks and other mortgage lenders by U.S. Postal Service, private or commercial interstate carriers, and/or facsimile.  In part, this false information included statements that different, unrelated buyers held assets in a particular bank, or had rental income, when, in truth, the source of funds in the bank were often temporarily deposited by defendant GILLIS and other co-conspirators, and the buyers did not have any rental income.

29.     It was further part of the conspiracy that the co-conspirators would provide cashier's checks to the settlement agents, including defendant GILLIS, purporting to be from the buyers as the buyers' cash contribution, although in truth they were funded by defendant GILLIS and/or defendant OREKOYA, or the lender's own money.  The co-conspirators would trick the lenders into believing that these cashier's checks were purchased by the buyers from their own

money, as required by the terms of the loans.

30.     It was further part of the conspiracy that at times the appraisers would falsely report the conditions of the residential properties, stating that the properties were in good condition or were newly renovated when, in fact, they were not.

31.     It was further part of the conspiracy that Co-conspirators A and B, and other settlement agents, would pay defendant GILLIS and others from illegally obtained settlement proceeds, often using fake "invoices" which falsely stated that renovation work had recently been completed and that money was due at settlement, although, in fact, no renovation work had been performed.  As a result of these false invoices, Co-conspirators A and B, and other settlement agents, turned over approximately $1 million of fraudulent loan proceeds to defendant GILLIS and defendant OREKOYA.

32.     It was further part of the conspiracy that at the closings on the various properties, the straw buyers and Co-conspirators A, B, and C signed HUD-1 settlement statements falsely certifying that they were true and accurate accountings of the funds disbursed.

33.     It was further part of the conspiracy that defendant GILLIS and defendant OREKOYA were the organizers and managers of this scheme and artifice to defraud.

34.     It was further part of the conspiracy that upon the closing on some of the properties, defendant GILLIS would rent out one or more properties through the Section 8 housing subsidy program for low-income tenants, would receive the rental payments from the DCHA in bank accounts in the name of straw buyers, which he controlled, then used the Section 8 funds to help perpetuate his on-going scheme to defraud lenders.

35.     During the course of the conspiracy, and in the manner described above,

defendant GILLIS, defendant OREKOYA, and their co-conspirators submitted loan applications to lenders that were false and fraudulent in some material fashion. The aggregate dollar amount of all loans procured fraudulently by defendant GILLIS and defendant OREKOYA from lenders exceeded $13 million, with at least eleven properties falling into foreclosure with a loss to the lenders in excess of $2.3 million.

## Overt Acts

In furtherance of the conspiracy and to effect the objects thereof, at least one of the overt acts, among others, was committed by at least one of the co-conspirators in the District of Columbia:

### 411 K Street, N.E.

36.     In or about October 2004, defendant GILLIS recruited Co-conspirator S to serve as a straw buyer in connection with the purchase of a residential property located at 411 K Street, N.E., Washington, D.C. Defendant GILLIS promised to pay Co-conspirator S $10,000 if Co-conspirator S agreed to participate in the sham transaction. Defendant GILLIS assured Co-conspirator S that defendant GILLIS would make all the mortgage payments and cover all costs associated with the purchase and upkeep of 411 K Street, N.E.

37.     On or about November 8, 2004, defendant GILLIS, through Investment 2000, prepared a fraudulent appraisal of 411 K Street, N.E. in order to support the false claim that the property was worth $433,000, when it was in fact not worth that much money.

38.     On or about November 17, 2004, in the District of Columbia and elsewhere, defendant OREKOYA interviewed Co-conspirator S via telephone and prepared the Uniform Residential Loan Application for Co-conspirator S.

39.     On or about December 6, 2004, in the District of Columbia and elsewhere,

defendant GILLIS and defendant OREKOYA, and their co-conspirators, arranged for Co-conspirator S to purchase 411 K Street, N.E. The loan documents submitted to the lender, Acoustic Home Loans, contained numerous false statements concerning the value of the home, and the buyer's income, assets, cash contribution, and intent to live in the property. Based on these false statements, Acoustic Home Loans agreed to lend Co-conspirator S $432,000.

40.     On or about December 6, 2004, defendant GILLIS, defendant OREKOYA, and/or their co-conspirators submitted or caused to be submitted an executed Deed of Trust to the District of Columbia's Recorder of Deeds, listing the Trustee as Chicago Title, 1129 20th Street, N.W., Washington, D.C. 20036.

41.     On or about January 2005, defendant GILLIS paid Co-conspirator S $10,000 as payment for serving as a straw buyer in the 411 K Street, N.E. transaction.

42.     On or about September 30, 2005, defendant OREKOYA purchased 411 K Street, N.E. from Co-conspirator S for $10.

43.     On or about November 2005, defendant GILLIS and defendant OREKOYA secured another fraudulent appraisal on 411 K Street, N.E. which falsely claimed that the property was worth $520,000, when in fact it was not worth that much money. This fraudulent appraisal enabled defendant OREKOYA to secure a mortgage loan from Finance America LLC for $468,000.

44.     On or about March 22, 2006, in the District of Columbia, defendant OREKOYA submitted a materially false and misleading loan application to SunTrust Bank, N.A. to secure a home equity line of credit on 411 K Street, N.E. for $50,000. Among other things, the loan application significantly understated defendant OREKOYA's liabilities.

45.     After settlement, defendant GILLIS, defendant OREKOYA, and their

co-conspirators failed to repay the mortgage loans on 411 K Street, N.E., and the lender was forced to foreclose and resell the property for a loss of approximately $102,000.

### 532 Oakwood Street, S.E.

46.     On or about May 19, 2005, defendant OREKOYA and Co-conspirator K submitted to the District of Columbia's Recorder of Deeds a Deed transfer purportedly "from parent to child" transferring 532 Oakwood Street, S.E., Washington, D.C., from Co-conspirator K, the purported parent, to defendant OREKOYA, the purported child.  Defendant OREKOYA and Co-conspirator K are unrelated.

47.     On or about May 16, 2006, in the District of Columbia, defendant OREKOYA executed a Uniform Residential Loan Application for a "cash-out" refinancing of 532 Oakwood Street, S.E.  These loan documents contained numerous false statements, including false information regarding the value of the home, and defendant OREKOYA's income, assets, and cash contribution.  The loan application also falsely stated that defendant OREKOYA had not had any ownership interest in any other property in the last three years.

48.     On or about May 23, 2006, in the District of Columbia, Co-conspirator V submitted a false Verification of Rent for defendant OREKOYA, claiming that from November 2002 through September 2005, defendant OREKOYA had paid $1,150 in rent for 411 K Street, N.E., and was never 30 days past due.  The loan documentation was also accompanied by a fraudulent appraisal prepared by defendant GILLIS's company, Market Watch, dated April 12, 2006, stating that the value of the property was $265,000, and that the property had a market rental value of $1,650 per month.  The fraudulent loan documents induced the lender, Fremont Investment & Loan, into lending defendant OREKOYA approximately $212,000.

49.     After settlement, defendant OREKOYA and her co-conspirators failed to repay

the mortgage loan, and the lender was forced to foreclose and resell the property for a loss.

### 229 R Street, N.E.

50.     In or about 2003, defendant GILLIS recruited Co-conspirators L and T to act as straw buyers and promised them $10,000 for each property that they agreed to put in their names on his behalf.  Defendant GILLIS also promised Co-conspirators L and T that he would pay all closing costs, remain responsible for any repairs on the properties, make all mortgage payments, and would resell each property within three to six months.

51.     On or about March 1, 2004, defendant GILLIS, through Investment 2000, prepared a fraudulent appraisal for 229 R Street, N.E., Washington, D.C.  The appraisal falsely claimed that 229 R Street, N.E. was  worth $505,000, when in fact it was not worth that much money.

52.     On or about March 24, 2004, defendant GILLIS and defendant OREKOYA arranged for Co-conspirators L and T to purchase 229 R Street, N.E.  Defendant OREKOYA prepared a loan package which was submitted to Meritage Mortgage Corp.  The information contained in the loan package was purportedly obtained from Co-conspirators L and T via telephonic interview.  The loan application and related supporting documentation contained numerous false and misleading statements concerning the value of the home, and the buyers' income, assets, employment, cash contribution, and intent to live in the property.  Meritage Mortgage Corp. relied on this false information in lending Co-conspirators L and T approximately $437,000.

53.     On or about April 2, 2004, the HUD-1 settlement statement for the purchase of 229 R Street, N.E. was signed by all the relevant parties, including Co-conspirators L and T.  The HUD-1 statement falsely noted that "cash from borrower" was $25,851.31, and gave the lender,

Meritage Mortgage Corp., the false impression that the buyers had a financial stake in the mortgage loan, although in truth the money came from defendant GILLIS.

54.     On or about June 2005, defendant GILLIS recruited Co-conspirator U to purchase 229 R Street, N.E., from Co-conspirators L and T.  Defendant GILLIS promised to pay Co-conspirator U $10,000 if Co-conspirator U agreed to purchase the property on defendant GILLIS's behalf.  Defendant GILLIS assured Co-conspirator U that defendant GILLIS would make all mortgage payments and cover associated costs for acquiring the property.  Co-conspirator U agreed to participate in this sham transaction.

55.     On or about July 11, 2005, defendant GILLIS and defendant OREKOYA arranged for Co-conspirator U to purchase 229 R Street, N.E. from Co-conspirators L and T.  The loan documents, which were prepared via telephonic interviews in the District of Columbia and elsewhere, contained numerous false statements regarding the value of the home, and the buyer's income, assets, cash contribution, and intent to live in the property.  These false statements induced the lender, Novastar Mortgage, Inc., into lending approximately $536,000 to Co-conspirator U.

56.     On or about July 26, 2005, a second HUD-1 form was prepared reflecting that Co-conspirator M was paid $7,000, Market Watch was paid $6,777, and Majestic Solutions was paid $10,000 from the sellers' (that is, the previous straw buyers, Co-conspirators L and T) proceeds from the July 11, 2005 purchase of 229 R Street, N.E.  There was no legitimate reason for these payments.  Rather, these payments were made to further enrich members of the conspiracy.

57.     On or about July 27, 2005, the $10,000 check to Majestic Solutions was endorsed over to appraiser Co-conspirator D.  Also, Co-conspirator A provided a check for $34,164.83 to Co-conspirators L and T.  Several days later, on or about August 1, 2005, on the instruction of

defendant GILLIS, Co-conspirator L paid Co-conspirator U $10,000 as payment for being a straw buyer on the 229 R Street, N.E. property.

58.     On or about July 26, 2005, in the District of Columbia and elsewhere, Co-conspirator A submitted an executed Deed to the District of Columbia's Recorder of Deeds, with the instructions that after the recordation of the deed, the Recorder of Deeds should return the stamped deed back to the title company at the address listed (Temple Hills, Maryland).

59.     On or about April 9, 2006, Co-conspirator D and/or defendant GILLIS prepared a materially misleading appraisal of 229 R Street, N.E., which falsely stated that the property had a fully finished basement and an updated kitchen.  The appraisal also falsely claimed that the property was valued at $577,000, when in fact it was not worth that much money.

60.     On or about April 17, 2006, defendant GILLIS and defendant OREKOYA caused Co-conspirator U's mortgage loan on 229 R Street, N.E. to be refinanced with Fremont Investment & Loan.  These loan documents, which were prepared via telephonic interview in the District of Columbia and elsewhere, contained numerous false statements, which induced the lender, Fremont Investment & Loan, into loaning approximately $559,000 to Co-conspirator U. Among other things, the loan application contained false information concerning the value of the home as well as the buyer's income, assets, cash contribution, and intent to live in the property.

61.     At the closing on the 229 R Street, N.E. refinancing, Co-conspirator A issued a check for $13,556.69 to Co-conspirator U as "disbursement to borrower."  On instructions from defendant GILLIS, Co-conspirator U purchased a cashier's check for $5,856.69 payable to Market Watch, at Bank of America's branch office located at 15th and Pennsylvania Avenue, S.E., Washington, D.C., and then gave that check to defendant GILLIS.

62.     After settlement, defendants and their co-conspirators failed to repay the mortgage

loans on 229 R Street, N.E., and the lender was forced to foreclose and resell the property for a loss of approximately $292,000.

**1126 8th Street, N.E.**

63.     In or about September 2004, defendant GILLIS and his co-conspirators arranged for Co-conspirator I to purchase 1126 8th Street, N.E., Washington, D.C., by promising to pay Co-conspirator I $10,000 in exchange for the sham purchase.  Defendant GILLIS also promised Co-conspirator I that defendant GILLIS would remain responsible for any repairs on the property, make all mortgage payments, and resell the property in the near future.  Co-conspirator I agreed to participate.  Thereafter, defendant GILLIS personally prepared the loan documents to facilitate the loan for Co-conspirator I to purchase 1126 8th Street, N.E.  The loan documents contained numerous false statements which induced the lender, Fremont Investment & Loan, into lending Co-conspirator I approximately $418,000 to purchase the property.  Among other things, the loan application contained false information concerning the value of the home as well as the buyer's income, assets, employment, cash contribution, and intent to live in the property.

64.     On or about September 24, 2004, defendant GILLIS deposited $8,000 into Co-conspirator I's Wachovia Bank account number XXXXXXXXX4921 to use as down payment at the closing of 1126 8th Street, N.E.

65.     On or about September 30, 2004, the closing for 1126 8th Street, N.E. occurred at Co-conspirator A's office.  The HUD-1 form falsely reflected that Co-conspirator I made a down payment of $4,877.86.  It was defendant GILLIS who provided the down payment.

66.     During the September 30, 2004 closing, Co-conspirator A acted as settlement agent and fiduciary for the seller and buyer in the ownership transfer of 1126 8th Street, N.E.  In this capacity, Co-conspirator A disbursed $120,000 for repairs to defendant GILLIS, d/b/a

-16-

Market Watch, although in truth this property did not receive $120,000 worth of repairs.

67.     In or about June 2005, defendants and their co-conspirators arranged for Co-conspirator J to purchase 1126 8th Street, N.E. from Co-conspirator I, by promising Co-conspirator J payment of $5,000.  Defendant GILLIS also promised Co-conspirator J that defendant GILLIS would remain responsible for any repairs on the property, make all mortgage payments, and resell the property in the near future.  Co-conspirator J agreed to participate in the sham transaction.  Thereafter, in the District of Columbia and elsewhere, defendant OREKOYA contacted Co-conspirator J and conducted a telephonic interview to prepare the loan package to facilitate this sham purchase of 1126 8th Street, N.E.  Although Co-conspirator J provided truthful information to defendant OREKOYA about his assets and liabilities, defendant OREKOYA significantly understated Co-conspirator J's liabilities and overstated his assets on the loan package submitted to the lender, Fremont Investment & Loan.  The loan documents further misstated Co-conspirator J's employment, cash contribution, and intent to live in the property.  These numerous false statements in the loan package induced Fremont Investment & Loan into loaning Co-conspirator J $540,000.

68.     On or about June 29, 2005, Co-conspirator D and/or defendant GILLIS prepared a materially misleading appraisal of 1126 8th Street, N.E., falsely representing that the 94-year old-property had been renovated and had "new hardwood floors, new kitchen, new baths, new paint and drywall, new appliances."  The appraisal falsely claimed that the property was worth $540,000 when in fact it was not worth that much money.  Fremont Investment & Loan also relied on this false appraisal to justify the $540,000 loan to Co-conspirator J.

69.     On or about July 29, 2005, defendant OREKOYA brought the HUD-1 statement and related closing documents to Co-conspirator J's office in Rockville, Maryland, and requested

that Co-conspirator J sign the documents.  Co-conspirator J complied.  Subsequently, Co-conspirator A submitted the HUD-1 form and related closing documents to Fremont Investment & Loan.  Also, despite the lack of invoices, Co-conspirator A paid off $70,600 from the seller's proceeds to individuals and entities who had no involvement with the transaction, including straw buyers from other transactions, and Majestic Solutions, which was paid $16,000.  Moreover, Co-conspirator A's SunTrust Bank, N.A. records show that on August 1, 2005, Co-conspirator A wired $44,000 from Co-conspirator A's Wachovia account #XXXXXXXXX5886 to Market Watch's SunTrust Bank, N.A. account #XXXXXX1050, purportedly from the seller's proceeds.  Previously, on July 27, 2005, in connection with the 229 R Street, N.E. transaction, a $10,000 check to Majestic Solutions had been signed over to Co-conspirator D's name and deposited in Co-conspirator D's bank account.

70.     After the settlement, defendant GILLIS, defendant OREKOYA, and their co-conspirators failed to repay the mortgage loans on 1126 8th Street, N.E., and the lender was forced to foreclose and resell the property for a loss of approximately $391,245.

**1835 Hamlin Street, N.E.**

71.     In or about July 2004, defendant GILLIS and his co-conspirators arranged for Co-conspirator O to purchase 1835 Hamlin Street, N.E., Washington, D.C., by promising Co-conspirator O $10,000.  Defendant GILLIS also promised Co-conspirator O that defendant GILLIS would remain responsible for any repairs on the property, make all mortgage payments, and resell the property in the near future.  Co-conspirator O agreed to participate in this sham transaction.  Thereafter, defendant GILLIS and defendant OREKOYA facilitated the preparation of the loan package for Co-conspirator O to purchase 1835 Hamlin Street, N.E.  The loan documents contained numerous false statements, which induced the lender, Wells Fargo Bank,

-18-

N.A., into lending Co-conspirator O approximately $455,000.  Among other things, the loan documents contained false information concerning the value of the home and the buyer's income, assets, employment, cash contribution, and intent to live in the property.

72.    On or about July 30, 2004, Co-conspirator O and defendant GILLIS went to co-Co-conspirator A's office in Temple Hills, Maryland, to conduct the closing on 1835 Hamlin Street, N.E.  At the direction of defendant GILLIS and Co-conspirator A, Co-conspirator O signed all of the closing documents as requested, including the HUD-1 settlement statement which falsely stated that "cash from buyer was $27,779."  In truth, Co-conspirator O did not provide any money at closing.  At the conclusion of the settlement, Co-conspirator A disbursed $91,350 to the Chevy Chase bank account of Co-conspirator D's company, A. Inc., for labor and materials in connection with purported renovations on 1835 Hamlin Street, N.E.  In fact, no renovations of the property were planned.  Co-conspirator A also distributed another $122,500 from the seller's proceeds to various associates of defendant GILLIS.

73.    In or around July 2004, defendant GILLIS instructed Co-conspirator O to meet with Co-conspirator V.  Co-conspirator V was responsible for assuring that Co-conspirator O became a participating landlord with the DCHA Section 8 program, so that defendant GILLIS and his co-conspirators could use Section 8 tenants and Government funds to help pay the various mortgages and perpetuate the mortgage fraud scheme.  As instructed, Co-conspirator O met with Co-conspirator V, who then got Co-conspirator O on the approval list to become a Section 8 landlord.  Subsequently, DCHA wired Section 8 rent payments to Co-conspirator O's bank account.  Co-conspirator O then transmitted the Section 8 rent payments to defendant GILLIS, who then used the funds to pay the mortgage on 1835 Hamlin Street, N.E., and other personal expenses.

74.    On or about August 5, 2004, Co-conspirator A wired $46,039 to Investment 2000's Chevy Chase bank account.  On August 31, 2004, Co-conspirator A wired another $75,800 to Investment 2000's Chevy Chase account.  Defendant GILLIS subsequently paid Co-conspirator O $10,000 for his role in purchasing 1835 Hamlin Street, N.E.

75.    In or about August 2005, defendant GILLIS arranged for Co-conspirator P to purchase 1835 Hamlin Street,  N.E., by promising Co-conspirator P that Co-conspirator P could take advantage of the tax breaks associated with the mortgage interest deductions on his tax returns.  Defendant GILLIS also promised Co-conspirator P that defendant GILLIS would be responsible for any repairs on the property, make all mortgage payments, and resell the property in the near future.  Co-conspirator P agreed.  Thereafter, defendant OREKOYA telephoned Co-conspirator P to gather information to prepare the loan documents for the purchase 1835 Hamlin Street, N.E.  The loan documents, which were prepared by defendant OREKOYA, contained numerous false statements, which induced the lender, Acoustics Home Loans, LLC, into lending Co-conspirator P approximately $510,000.  Among other things, the loan application contained false information concerning the value of the home as well as the buyer's income, assets, employment, cash contribution, and intent to live in the property.

76.    On or about August 9, 2005, Co-conspirator D prepared a materially misleading appraisal of 1835 Hamlin Street, N.E., falsely representing that the 93-year-old property had been renovated and had "Jacuzzi tub, new carpet, new windows, new kitchen, new appliances, new roof, new baths," and was valued at $542,000.  Acoustic Home Loans, LLC relied on this false appraisal to justify the $510,000 loan to Co-conspirator P.

77.    On or about August 31, 2005, defendant GILLIS accompanied Co-conspirator P to the closing on the 1835 Hamlin Street, N.E. property.  The settlement took place at C.T. & E.'s

Laurel, Maryland office.  Also present was Co-conspirator B, who handled the closing.  The HUD-1 form, which was signed by the previous straw buyer, Co-conspirator O, the new straw buyer, Co-conspirator P, and the settlement agent, Co-conspirator B, falsely represented that cash from the borrower was $8,794.25.  In truth, Co-conspirator P did not pay any money at the closing.  Moreover, despite the lack of any supporting invoices, Co-conspirator B disbursed as "payoffs" the following from the seller's funds: $32,853.27 to Market Watch and $5,000 to Majestic Solutions.

78.     On or about August 31, 2005, in the District of Columbia and elsewhere, Co-conspirator B submitted an executed Deed to the District of Columbia's Recorder of Deeds, with the instructions that after the recordation of the Deed, the Recorder of Deeds should mail the stamped Deed back to the title company at the address listed (Laurel, Maryland).

79.     After settlement, defendant GILLIS and defendant OREKOYA, and their co-conspirators, failed to repay the mortgage loans on 1835 Hamlin Street, N.E., and the lender was forced to foreclose and resell the property for a loss of approximately $327,715.

**4230 19th Place, N.E.**

80.     On or about July 23, 2004, defendant GILLIS prepared a fraudulent appraisal for 4230 19th Place, N.E., stating falsely that the property had an estimated value of $360,000, and that an appraiser, Co-conspirator E, had prepared the appraisal, when in reality defendant GILLIS had prepared the appraisal.

81.     In or about August 2004, defendant GILLIS recruited Co-conspirator N by promising Co-conspirator N money in exchange for purchasing real estate on behalf of defendant GILLIS.  Defendant GILLIS assured Co-conspirator N that defendant GILLIS would pay all fees, mortgages, and costs associated with purchasing and owning the property.

82.     On or about August 31, 2004, defendant GILLIS and defendant OREKOYA arranged for Co-conspirator N to purchase 4230 19th Place, N.E., Washington, D.C.  The loan documents, which were prepared via telephonic interview, contained numerous false statements, which induced the lender, Acoustic Home Loans, LLC, into lending Co-conspirator N approximately $320,000 to purchase the home.  Among other things, the loan application contained false information concerning the value of the home, and the buyer's income, assets, employment, cash contribution, and intent to live in the property.

83.     On or about August 2005, defendant GILLIS and defendant OREKOYA arranged for Co-conspirator R to purchase 4230 19th Place, N.E. from straw buyer Co-conspirator N.  The loan documents, which were prepared via telephonic interview, contained numerous false statements, which induced the lender, Acoustic Home Loans, LLC, into lending approximately $495,000 to Co-conspirator R.  Among other things, the loan application included false information concerning the value of the home as well as the buyer's income, assets, employment, cash contribution, and intent to live in the property.

84.     On or about August 31, 2005, defendant GILLIS prepared a fraudulent appraisal for 4230 19th Place, N.E., stating falsely that the property had an estimated value of $500,000, when it was in fact not worth that much money, and that an appraiser, Co-conspirator E, had prepared it, when in reality defendant GILLIS had prepared the appraisal.  Acoustic Home Loans, LLC relied on this fraudulent August 31, 2005 appraisal when it loaned approximately $495,000 to Co-conspirator R to purchase the home.

85.     On or about September 16, 2005, Co-conspirator R attended the closing on the purchase of 4230 19th Place, N.E., at Co-conspirator A's office in Temple Hills, Maryland.  Co-conspirator C served as the settlement agent.  Despite the lack of supporting invoices, the HUD-1

document reflected that funds from the seller's proceeds were distributed to, among others, the following: $65,775 to Market Watch; $8,700 to A. Inc. (Co-conspirator D's company), and $60,000 to M&R Services.  The HUD-1 form also falsely stated that the $60,000 to M&R Services was a "payoff to creditor," when, in reality, it was part of Co-conspirator N's compensation, and should have been listed in the "Cash to Seller" portion of the HUD-1 document.

86.     On or about September 16, 2005, in the District of Columbia and elsewhere, Co-conspirator A submitted an executed Deed to the District of Columbia's Recorder of Deeds, with the instructions that after the recordation of the Deed, the Recorder of Deeds should return the stamped Deed back to the title company at the address listed (Temple Hills, Maryland).

87.     After settlement, defendant GILLIS and his co-conspirators failed to repay the mortgage loan and the lender was forced to foreclose and resell the property for a loss of about $176,000.

### 908 7th Street, N.E.

88.     In or about October 2004, defendant GILLIS and his co-conspirators arranged for Co-conspirator I and Co-conspirator G to purchase 908 7th Street, N.E., Washington, D.C. Defendant GILLIS promised Co-conspirators I and G additional money if they agreed to purchase another property as straw buyers.  Defendant GILLIS also promised Co-conspirators I and G that defendant GILLIS would remain responsible for any repairs on the property, make all mortgage payments, and resell the property in the near future.  Co-conspirators I and G agreed to the sham arrangement.  Thereafter, defendant GILLIS and defendant OREKOYA facilitated the preparation of the loan package for Co-conspirators I and G to purchase 908 7th Street, N.E.  The loan documents contained numerous false statements which induced the lender, Novastar

Mortgage, Inc., into loaning Co-conspirators I and G approximately $427,500.  Among other things, these loan documents contained false information regarding the value of the home as well as the buyers' income, assets, employment, cash contribution, and intent to live in the property.

89.     On or about September 23, 2005, defendant GILLIS arranged for Co-conspirator R to purchase 908 7th Street, N.E., from Co-conspirators I and G, by promising to pay money to Co-conspirator R.  Defendant GILLIS assured Co-conspirator R that defendant GILLIS would remain responsible for any repairs to the property, make all mortgage payments, and resell the property in the near future.  Co-conspirator R agreed to participate in this sham transaction.  Thereafter, defendant GILLIS and defendant OREKOYA facilitated the preparation of the loan package for Co-conspirator R to purchase 908 7th Street, N.E.  The loan documents contained numerous false statements which induced the lender, Fremont Investment & Loan, into lending $518,000 to Co-conspirator R to purchase the home.  Among other things, the loan application contained false information concerning the value of the home, and the buyer's income, assets, employment, cash contribution, and intent to live in the property.

90.     In or about September 2005, Co-conspirator D, through A. Inc., and/or defendant GILLIS caused a materially false and misleading appraisal on 908 7th Street, N.E. to be prepared.  This fraudulent appraisal stated that the value of the property was $518,000, when in fact it was worth less than that amount.  Fremont Investment & Loan relied on this false appraisal to justify its $517,000 loan to Co-conspirator R.

91.     On or about September 23, 2005, defendant GILLIS accompanied Co-conspirator R to the closing on 908 7th Street, N.E.  The settlement took place at C.T. & E.'s Laurel, Maryland office.  Also present was Co-conspirator B, who handled the closing.  Despite the lack of any supporting invoices, Co-conspirator B disbursed, as "payoff" from seller's funds, $15,000

to Co-conspirator I.

92.    On or about September 23, 2005, in the District of Columbia and elsewhere, Co-conspirator B submitted an executed Deed to the District of Columbia's Recorder of Deeds, with the instructions that after the recordation of the Deed, the Recorder of Deeds should mail the stamped Deed back to the title company at the address listed.

### 920 47th Place, N.E.

93.    In or about September 2005, defendant GILLIS and his co-conspirators arranged for a straw buyer, Co-conspirator R, to purchase 920 47th Place, N.E., Washington, D.C., by promising money to Co-conspirator R.  As with the previous deals with Co-conspirator R, defendant GILLIS promised Co-conspirator R that defendant GILLIS would remain responsible for any repairs on the property, make all mortgage payments, and resell the property in the near future.  Co-conspirator R agreed to participate in this sham transaction.  Thereafter, defendant GILLIS and defendant OREKOYA facilitated the preparation of the loan package for Co-conspirator R to purchase 920 47th Place, N.E.  The loan documents which were submitted to Wells Fargo Bank, N.A. contained numerous false statements, which induced Wells Fargo Bank, N.A., into lending Co-conspirator R approximately $350,000.  Among other things, the loan documents included false information regarding the value of the home, and the buyer's income, assets, employment, cash contribution, and intent to live in the property.

94.    On or about September 20, 2005, Co-conspirator D, through A. Inc., and/or defendant GILLIS caused an appraisal on 920 47th Place, N.E. to be prepared, which represented that the property was valued at $320,000.  However, the appraisal failed to disclose the appraisers' lack of independence from the straw buyer, Co-conspirator R, and the appraisers' financial interest in the subject property.  Wells Fargo Bank, N.A. also relied on this appraisal to

justify the $350,000 loan to Co-conspirator R.

95.     On or about September 30, 2005, Co-conspirator R attended the closing on 920

47th Place, N.E.  The settlement took place at C.T. & E.'s Laurel, Maryland office.  Also present

was Co-conspirator B, who handled the closing.  Despite the lack of any supporting invoices, Co-

conspirator B disbursed $45,000 as "payoff" from seller's funds to Market Watch.

96.     On or about September 30, 2005, in the District of Columbia and elsewhere, Co-

conspirator B submitted an executed Deed to the District of Columbia's Recorder of Deeds, with

the instructions that after the recordation of the Deed, the Recorder of Deeds should mail the

stamped Deed back to the title company at the address listed (Laurel, Maryland).

97.     After settlement, defendant GILLIS and his co-conspirators made a few payments

on the mortgage.  Thereafter, however, defendant GILLIS and his co-conspirators failed to repay

the mortgage loan and the lender was forced to foreclose and resell the property.

**540 23rd Place, N.E.**

98.     In or about June 2005, defendant GILLIS recruited a straw buyer, Co-conspirator

H, by promising to pay Co-conspirator H.  Defendant GILLIS assured Co-conspirator H that the

transaction was legal and that defendant GILLIS would pay all fees and mortgages, and sell the

property within six months.

99.     On or about January 17, 2006, defendant GILLIS and defendant OREKOYA

arranged for Co-conspirator H to purchase 540 23rd Place, N.E., Washington, D.C.  The loan

documents, which were prepared via telephonic interview, contained numerous false statements

which induced the lender, WMC Mortgage Corp., to lend approximately $415,000 to Co-

conspirator H.  Among other things, the loan application included false information concerning

the value of the home, and the buyer's income, assets, employment, cash contribution, and intent

to live in the property.

100.    On or about January 27, 2006, defendant GILLIS provided Co-conspirator H with a check (number 1138) from his SunTrust Bank, N.A. account no. XXXXXXXX13979 for $12,944.53 for a "buyer's fee," and to pay the down payment to purchase 540 23rd Place, N.E.

101.    On or about January 27, 2006, Co-conspirator H attended the closing on the purchase of 540 23rd Place, N.E., and provided the settlement agent with a check for $2,662.18. Although the lender required the buyer to have a financial stake in the mortgage loan, in truth it was defendant GILLIS who supplied the $2,662.18.  After the closing on the property, defendant GILLIS and defendant OREKOYA caused the submission of disclosure notices to the lender which contained the forged signature of Co-conspirator H on, among other things, an affidavit of occupancy stating that the property was going to be Co-conspirator H's primary residence, although in truth Co-conspirator H had no intention of using the property as a primary residence.

102.    On or about March 2, 2006, defendant GILLIS received $76,591.85 as a "payoff" from the settlement agent who handled the closing for 540 23rd Place, N.E.

103.    After the settlement, defendant GILLIS and his co-conspirators failed to repay the mortgage loan and the lender was forced to foreclose and resell the property for a loss of approximately $249,235.

### 726 Gresham Place, N.E.

104.    On or about February 1, 2006, defendant GILLIS and his co-conspirators arranged for straw buyers, Co-conspirators I and G, to purchase 720 Gresham Place, N.E., Washington, D.C., by promising to pay Co-conspirators I and G for their assistance.  As with the previous deals with Co-conspirators I and G, defendant GILLIS promised them that he would remain responsible for any repairs on the property, make all mortgage payments, and resell the property

in the near future.  Co-conspirators I and G agreed.  Thereafter, defendant GILLIS and defendant OREKOYA facilitated the preparation of the loan package for Co-conspirators I and G to purchase 726 Gresham Place, N.E.  The loan documents, which were submitted to Meritage Mortgage Corp., contained numerous false statements, which induced Meritage Mortgage Corp. into lending Co-conspirators I and G approximately $440,000.  Among other things, the loan application contained false information concerning the value of the home, and the buyers' income, assets, employment, cash contribution, and intent to live in the property.

105.    On or about March 1, 2006, Co-conspirator D, through A. Inc., and/or defendant GILLIS, prepared an appraisal of 726 Gresham Place, N.W., stating that the property was valued at $445,000.  The appraisal failed to disclose the appraisers' lack of independence from the straw buyers, and the appraisers' financial interest in the subject property.  Meritage Mortgage Corp. relied on this appraisal to justify the $440,000 loan to Co-conspirators I and G.

106.    On or about March 1, 2006, Co-conspirator I, accompanied by defendant GILLIS, attended the closing on 726 Gresham Place, N.W.  The settlement took place in Landover, Maryland.  Despite the lack of any supporting invoices, $73,903 was disbursed as "payoff" from seller's funds to Market Watch.

107.    On or about March 1, 2006, in the District of Columbia and elsewhere, the settlement agent submitted an executed Deed to the District of Columbia's Recorder of Deeds, with the instructions that after the recordation of the Deed, the Recorder of Deeds send the stamped Deed back to the title company at the address listed (Landover, Maryland).

108.    After settlement, defendant GILLIS and his co-conspirators failed to repay the mortgage loan and the lender was forced to foreclose and resell the property.  As a result, the lender sustained a loss of approximately $248,997.

**2007 Franklin Street, N.E.**

109.    In or about March 2006, defendant GILLIS recruited a straw buyer, co-Conspirator Q, to purchase residential property on defendant GILLIS's behalf by promising Co-conspirator Q money in exchange for serving as a nominee.  Defendant GILLIS  promised that he would arrange everything, including the down payment, any renovation, and mortgages. Defendant GILLIS also stated that he would eventually sell the property to HUD's Section 8 program.

110.    On or about March 2006, defendant GILLIS and defendant OREKOYA arranged for Co-conspirator Q to purchase 2007 Franklin Place, N.E., Washington, D.C.

111.    On or about March 17, 2006, defendant GILLIS directed Co-conspirator Q to submit a Uniform Residential Loan Application to him via facsimile from Co-conspirator Q's place of employment in the District of Columbia, facsimile number (202) 616-XXXX, to defendant GILLIS's facsimile number in Georgia, (770) 465-XXXX, in order to secure a loan to purchase 2007 Franklin Street, N.E.  Defendant GILLIS also requested that Co-conspirator Q provide him with W-2s, a thrift savings plan statement, an earnings statement, a utility bill, and other credit information.  Co-conspirator Q complied with these requests.

112.    On or about June 5, 2006, defendant GILLIS and/or co-conspirator D prepared a materially misleading appraisal of 2007 Franklin Street, N.E., falsely claiming that the property had an estimated value of $400,000, when in fact it was not worth that much money.  The appraisal was addressed to BancStar, located at 1449 Pennsylvania Avenue, S.E., Washington, D.C.

113.    In or about early June 2006, defendant GILLIS accompanied Co-conspirator Q to SunTrust Bank, N.A., located on U Street, N.W., in the District of Columbia, and opened a joint

bank account with Co-conspirator Q through an employee who worked at SunTrust Bank, N.A. Defendant GILLIS explained to Co-conspirator Q that the SunTrust Bank, N.A. account was required in order to make it appear that Co-conspirator Q had money in the bank, which was necessary to secure the mortgage on the 2007 Franklin Street, N.E. property.

114.    On or about June 23, 2006, loan documents were prepared at the direction of defendant GILLIS, on behalf of Co-conspirator Q, to obtain a $400,000 loan from Fremont Investment & Loan to purchase 2007 Franklin Street, N.E.  The loan documents, which were prepared via telephonic interview, contained numerous false statements which induced Fremont Investment & Loan into lending approximately $400,000 to Co-conspirator Q.  Among other things, the loan application contained false information concerning the value of the home, and the buyer's income, marital status, assets, liabilities, employment, cash contribution, and intent to live in the property.

115.    On or about June 23, 2006, in the District of Columbia, Co-conspirator Q, accompanied by defendant GILLIS, attended the closing for the purchase of 2007 Franklin Street, N.E.  During the settlement, defendant GILLIS instructed Co-conspirator C to wire $76,000 to defendant GILLIS that was purportedly due to Market Watch.  The settlement files do not contain any supporting invoices from Market Watch to justify approximately $76,252.88 that were paid from the seller's funds at settlement.  At the conclusion of the settlement, Co-conspirator C supplied Co-conspirator Q with a copy of the HUD-1 document which failed to disclose that Market Watch received any money from the closing, and reflected "Cash to Seller" as $353,417.87.  However, the HUD-1 document submitted to Fremont Investment & Loan reflected "Cash to Seller" as $282,219.99, and that Market Watch received $76,252.88.

116.    After settlement, Co-conspirator B, the owner of C.T. & E. title company,

submitted the Deed for filing with the District of Columbia's Recorder of Deeds, with instructions that the Recorder of Deeds return to the title company, by mail, to its Laurel, Maryland office, the stamped recorded Deed as proof that the legal title to the property was transferred from seller to buyer.

117.    On or about June 27, 2006, after the closing on 2007 Franklin Street, N.E., defendant GILLIS telephoned Co-conspirator Q at Co-conspirator Q's place of employment in Washington, D.C., and instructed Co-conspirator Q to re-submit a signed copy of the fraudulent Uniform Residential Loan Application to Fremont Investment & Loan.  Co-conspirator B from C.T. & E., Inc. then faxed the loan document to Co-conspirator Q at her office facsimile number, (202) 616-XXXX, with a notation stating, "Please sign."  As instructed by defendant GILLIS, Co-conspirator Q signed the fraudulent document, then sent it via facsimile to Fremont Investment & Loan, at (813) 901-XXXX.

118.    On or about August 28, 2006, defendant GILLIS contacted Co-conspirator Q by telephone at work in the District of Columbia and requested that she send him via facsimile, to (301) 645-XXXX, a copy of the Deed of Trust for 2007 Franklin Street, N.E. (which falsely stated, among other things, that Co-conspirator Q was "an unmarried person").  Co-conspirator Q complied.

119.    Thereafter, from time to time, defendant GILLIS made mortgage loan payments to Fremont Investment & Loan, using a SunTrust Bank, N.A. account in Co-conspirator Q's name that he controlled by using Co-conspirator Q's name and a false social security number.

120.    On November 26, 2006, unbeknownst to Co-conspirator Q, defendant GILLIS purchased a certified check from SunTrust Bank, N.A. for $10,100, which stated falsely that Co-conspirator Q was the purchaser of the certified check, then caused the check to be submitted to

Fremont Investment & Loan as credit on the mortgage account of Co-conspirator Q.  Soon

thereafter, defendant GILLIS made additional payments on the mortgage loan drawn on the

fraudulent SunTrust Bank, N.A. account controlled by defendant GILLIS in Co-conspirator Q's

name.  Two of the checks from that account were returned for insufficient funds.

121.    Thereafter, defendant GILLIS and his co-conspirators failed to repay the mortgage

loan, and the lender was forced to foreclose and resell the property for a loss of approximately

$279,936.

**(Conspiracy to Commit Bank, Mail, and Wire Fraud,
in violation of Title 18, United States Code, Section 1349)**

### COUNT TWO

**(BANK FRAUD)**

1.      From in or about October 2004, until in or about June 2006, within the District of

Columbia and elsewhere, defendant GILLIS and defendant OREKOYA devised and intended to

devise a scheme, and aided and abetted the scheme, to defraud a financial institution, that is,

SunTrust Bank, N.A., and to obtain money owned by and under the custody and control of

SunTrust Bank, N.A., by means of false and fraudulent pretenses, representations, and promises.

2.      Paragraphs 1 through 20 and 36 through 121 of Count One of this indictment are

hereby realleged, and contain the description of the above-mentioned scheme.

**(Bank Fraud and Aiding and Abetting and Causing an Act to be Done,
in violation of Title 18, United States Code, Sections 1344 and 2)**

### COUNT THREE

**(BANK FRAUD)**

1.      From in or about July 2004, until in or about September 2005, within the District

of Columbia and elsewhere, defendant GILLIS and defendant OREKOYA devised and intended

to devise a scheme, and aided and abetted the scheme, to defraud a financial institution, that is, Wells Fargo Bank, N.A., and to obtain money owned by and under the custody and control of Wells Fargo Bank, N.A., by means of false and fraudulent pretenses, representations, and promises.

2.       Paragraphs 1 through 20 and 36 through 121 of Count One of this indictment are hereby realleged, and contain the description of the above-mentioned scheme.

**(Bank Fraud and Aiding and Abetting and Causing an Act to be Done,
in violation of Title 18, United States Code, Sections 1344 and 2)**

## COUNTS FOUR THROUGH EIGHT

**(MAIL FRAUD)**

1.       From in or about July 2005, until in or about August 2006, within the District of Columbia and elsewhere, defendant GILLIS and defendant OREKOYA devised and intended to devise, and aided and abetted, a scheme to defraud mortgage lenders by obtaining excessive mortgage loans on properties through fraudulent loan applications, false appraisals, and fraudulent settlements, with such sales generating large cash proceeds, as is more fully described below.

2.       Paragraphs 1 through 20 and 36 through 121 of Count One of this indictment are hereby realleged, and contain the description of the above-mentioned scheme.

3.       Sometime after the dates listed below, in the District of Columbia and elsewhere, defendant GILLIS and defendant OREKOYA, for the purpose of executing, and attempting to execute and aiding and abetting the execution of, the above-described scheme to defraud, and for obtaining money and property by false and fraudulent pretenses, representations, and promises, did knowingly cause to be delivered by the United States Postal Service, from the District of

Columbia Recorder of Deeds, located at 515 D Street, N.W., Washington, D.C., to an address

where defendant GILLIS and defendant OREKOYA directed the mail to be sent, that is, to a title

company in the State of Maryland, mail matter, that is, file-stamped Deeds for the properties

listed below:

| COUNT | DATE | PROPERTY |
|-------|------|----------|
| FOUR | July 26, 2005 | 229 R Street, N.E. |
| FIVE | August 31, 2005 | 1835 Hamlin Street, N.E. |
| SIX | September 16, 2005 | 4230 19th Place, N.E. |
| SEVEN | September 23, 2005 | 908 7th Street, N.E. |
| EIGHT | September 30, 2005 | 920 47th Place, N.E. |
| NINE | March 1, 2006 | 726 Gresham Place, N.W. |
| TEN | June 23, 2006 | 2007 Franklin Street, N.E. |

**(Mail Fraud and Aiding and Abetting and Causing an Act to Be Done,
in violation of Title 18, United States Code, Sections 1341 and 2)**

## COUNTS ELEVEN THROUGH FOURTEEN

**(WIRE FRAUD)**

1.      From in or about September 2003, until in or about November 2009, within the

District of Columbia and elsewhere, defendant GILLIS and defendant OREKOYA devised and

intended to devise, and aided and abetted, a scheme to defraud mortgage lenders by submitting

and causing to be submitted Uniform Residential Loan Applications that overstated assets and

understated liabilities so as to induce the lenders into believing that the buyers were more credit

worthy than they actually were, as is more fully described below.

2.      Paragraphs 1 through 20 and 36 through 121 of Count One of this Indictment are

hereby realleged, and contain the description of the above-mentioned scheme.

3.     On or about the dates listed below, in the District of Columbia and elsewhere, defendant GILLIS and defendant OREKOYA, for the purpose of executing and attempting to execute the above-described scheme to defraud, did willfully cause to be transmitted in interstate commerce from or to the District of Columbia from or to the State of Maryland, Georgia, or Florida, by means of a wire communication, certain signs and signals, that is, electronic mail containing loan applications or deeds of trust for the below listed properties, which are located within the District of Columbia:

| COUNT | DATE | WIRE TRANSMISSION |
|---|---|---|
| **ELEVEN** | March 17, 2006 | Uniform Loan Application via facsimile from (202) 616-XXXX to (770) 465-XXXX, concerning 2007 Franklin Street, N.E. |
| **TWELVE** | June 27, 2006 | Uniform Loan Application via facsimile from (202) 616-XXXX to (813) 390-XXXX, concerning 2007 Franklin Street, N.E. |
| **THIRTEEN** | June 27, 2006 | Uniform Loan Application via facsimile from (301) 323-XXXX to (202) 616-XXXX |
| **FOURTEEN** | August 28, 2006 | Deed of Trust via facsimile from (202) 616-XXXX to (301) 345-XXXX |

**(Wire Fraud and Aiding and Abetting and Causing an Act to Be Done,
in violation of Title 18, United States Code, Sections 1343 and 2)**

## FORFEITURE ALLEGATION

1.     The violations alleged in Counts One, Four, Six, Seven, and Nine through Fourteen of this Indictment are realleged and incorporated by reference herein for the purpose of alleging forfeiture to the United States of America pursuant to the provisions of 18 U.S.C. §

981(a)(1)(C) and 28 U.S.C. § 2461(c).

2.      As a result of the offenses alleged in Counts One, Four, Six, Seven, and Nine

through Fourteen of this Indictment, the defendants in this Indictment shall forfeit to the United

States any property constituting, or derived from, proceeds obtained directly or indirectly, as the

result of conspiracy, in violation of 18 U.S.C. § 1349, mail fraud, in violation of 18 U.S.C. §

1341, and wire fraud, in violation of 18 U.S.C. § 1343, including, but not limited to:

<u>Money Judgment</u>

$1,091,287, which represents a sum of money equal to property constituting, or
derived from, proceeds obtained, directly or indirectly, as the result of conspiracy,
in violation of 18 U.S.C. § 1349; mail fraud, in violation of 18 U.S.C. § 1341; and
wire fraud, in violation of 18 U.S.C. § 1343.  Fed. R. Crim. P. 32.2(b)(1); and

<u>Real Property</u>

A residential real property owned by Gillis, located at XXXX Greenridge Avenue,
Lithonia, Georgia.

By virtue of the commission of the felony offenses charged in Counts One, Four, Six,

Seven, and Nine through Fourteen of this Indictment, any and all interest that the defendants

have in property constituting, or derived from, proceeds obtained directly or indirectly, as the

result of such offenses is vested in the United States and hereby forfeited to the United States

pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

3.      If any of the property described above as being subject to forfeiture pursuant to 18

U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), as a result of any act or omission of the

defendants:

(a)      cannot be located upon the exercise of due diligence;
(b)      has been transferred or sold to, or deposited with, a third person;
(c)      has been placed beyond the jurisdiction of the Court;
(d)      has been substantially diminished in value; or
(e)      has been commingled with other property that cannot be subdivided

without difficulty;

it is the intention of the United States, pursuant to 18 U.S.C. § 982(b)(1), incorporating by

reference 21 U.S.C. § 853(p), to seek forfeiture of any other property of said defendants up to the

value of said property listed above as being subject to forfeiture.

**(Criminal Forfeiture, in violation of Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c))**

A TRUE BILL:


FOREPERSON


/s/
ATTORNEY FOR THE UNITED STATES IN
AND FOR THE DISTRICT OF COLUMBIA